IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

PEARSON'S PHARMACY, INC., *et al.*,   )
                                      )
              Plaintiffs,             )
                                      )
      v.                              )    CASE NO. 3:06-CV-73-WKW [WO]
                                      )
EXPRESS SCRIPTS, INC.,                )
                                      )
              Defendant.              )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Pearson's Pharmacy, Inc., and CAM Enterprises, Inc. (d/b/a Altadena Pharmacy) filed this class action, alleging that Defendant Express Scripts, Inc., a pharmacy benefit manager, failed to reimburse them for brand name prescription drugs in accordance with their contracts based upon the drug's average wholesale price as updated on a daily basis.[1] Pending are Plaintiffs' motion for partial summary judgment (Doc. # 57) and ESI's motion for summary judgment (Doc. # 62). The motions, which are accompanied by evidentiary submissions and briefs, focus on the remaining claims for breach of contract and injunctive relief.[2] Responses also have been filed.[3] (Docs. # 66, 69, 73.) Based upon careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the

---

[1] Plaintiffs are referred to individually as "Pearson's" and "Altadena," and Defendant is referred to as "ESI."

[2] At the joint request of the parties, the substantive issues are being decided prior to any resolution of the class certification question.

[3] For ease of reference, the parties' summary judgment briefs and responses are referred to by their assigned docket number.

court finds that Plaintiffs' motion for summary judgment is due to be denied and that ESI's motion for summary judgment is due to be granted.[4]

## I. JURISDICTION AND VENUE

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. § 1332. The parties do not contest personal jurisdiction or venue, and the court finds that there are allegations sufficient to support both.

## II. FACTUAL AND PROCEDURAL BACKGROUND[5]

### A. Parties

Pearson's and Altadena owned and operated retail pharmacies in Dadeville, Alabama, and in the Birmingham, Alabama area, respectively. Plaintiffs are Alabama corporations and maintain their principal places of business in Alabama.

ESI, a Delaware corporation with its principal place of business in Maryland Heights, Missouri, is a pharmacy benefit manager ("PBM"). PBMs contract with third-party payors or health-plan administrators, such as insurers, HMOs, and employers, to facilitate delivery of prescription drugs to the health-plan members or other individuals to whom the third-party payors provide prescription drug benefits. PBMs assist third-party payors and health-plan administrators by adjudicating claims for prescription drug benefits submitted by pharmacies,

---

[4] Also pending is Plaintiffs' motion to strike certain evidence submitted by ESI in support of its summary judgment motion (Doc. # 67), which ESI has opposed (Doc. # 71). The motion to strike is due to be denied as moot because the court has not considered the challenged evidence in ruling on ESI's summary judgment motion.

[5] The majority of the salient facts are not in contention.

thereby acting as intermediaries between the third-party payors and pharmacies in providing pharmacy benefits.  PMBs create pharmacy networks by negotiating with retail pharmacies that agree to accept defined reimbursement rates when they fill prescriptions for health-plan members.[6]

Pearson's entered into an agreement with ESI in 1995 to be a participant in various pharmacy networks.  (Pearson's Pharmacy Agreement (Ex. 3 to Doc. # 57); *see also* Chris Macinski Dep. 112-24 (discussing pharmacy networks) (Ex. 1 to Doc. # 69); Luft Dep. 160 (testifying that ESI has "about 300 networks").)  Also, since at least 1999, Altadena has belonged to networks adjudicated by ESI.  Written contracts govern ESI's relationships with Pearson's and Altadena and encompass multiple documents, including a Pharmacy Provider Agreement ("Pharmacy Agreement") and Pharmacy Network Manual ("Provider Manual").[7] The material terms of the Pharmacy Agreements and Provider Manuals at issue in this lawsuit are the same as to Pearson's and Altadena.[8]   It, therefore, is unnecessary to

---

[6] This description of PBMs is taken from ESI's introductory statement (Doc. # 62, at 4) and has not been disputed by Plaintiffs.  ESI is the third largest PBM in the industry.  (Luft Dep. 210.)  Francis Kannady, ESI's senior director of corporate financial systems within IT, testified that ESI adjudicates "in excess of a million claims a day."  (Kannady Dep. 8, 22 (Ex. 14 to Doc. # 57).)  "Adjudicate" is a term of art used by ESI's representatives.  Prescription drug claims are "adjudicated" on ESI's various computer systems, such as the Anchor system, discussed *infra*.  (Macinski Dep. 77.)

[7] The parties refer to these documents as the Pharmacy Agreement and the Provider Manual.  The court does the same.

[8] An executed contract between Altadena and ESI has not been located, and each party blames the other for the loss of the contract.  (*See, e.g.*, Attorney Email Exchange (Ex. 4 to Doc. # 57).)  For purposes of the cross-motions for summary judgment, the parties have stipulated that an unexecuted Pharmacy Agreement submitted by Altadena is the operative agreement between the parties.  (*See* Pharmacy Agreement (Ex. 7 to Doc. # 57).)

differentiate between the Pharmacy Agreements and Provider Manuals when addressing the breach of contract claim.

**B.   Pharmacy Agreement**

*1.   Average Wholesale Price*

The Pharmacy Agreement provides that Pearson's and Altadena, as participating pharmacies, will be paid for pharmacy services in accordance with a "net payment schedule," less applicable copayments received by the pharmacy.   (Pharmacy Agreement § 3A.) Typically, and in this case, a component of PBM pricing and reimbursement is Average Wholesale Price ("AWP").   AWP is not defined in the Pharmacy Agreement.   Nor is AWP defined in the Provider Manual.   The Provider Manual merely explains that one of two methods (AWP being a component of one method), whichever is "lower," is used to calculate reimbursements.   (*See, e.g.*, 2002 Provider Manual 10 (Ex. A5 to Doc. # 62).)   According to the Amended Complaint, however, "AWP is the average of the prices charged by national drug wholesalers for a given prescription drug."[9]   (Am. Compl. ¶ 9; *see also* Macinski Dep. 132 (AWP "is a price that is provided by a number of pricing services that is supposed to be reflective of what the average wholesale price is.   However, no one actually pays that price. They pay something less than that price.").)

Changes in AWP for brand name prescription drugs are compiled by pricing services, such as First DataBank, which provide the pricing information to subscribers on a periodic

---

[9] ESI has not disputed the Amended Complaint's definition.

basis.  ESI subscribes to daily, weekly and monthly AWP updating services from First DataBank. (Macinski Dep. 143-44, 159-60, 162; Luft Dep. 181; Francis Kannady Dep. 118 (Ex. 14 to Doc. # 57).)

### 2.    *Merger Clause*

The Pharmacy Agreement includes a merger clause.  It provides that the "Agreement, including . . . the Provider Manual, constitutes the entire understanding of the parties hereto with respect to the subject matter hereof and, upon execution by the parties supersedes all prior oral or written agreements between the parties with respect to the subject matter hereof."  (Pharmacy Agreement § 9C.)

### 3.    *Amendments*

The Pharmacy Agreement also contains a provision governing the procedures for amending its terms.  Amendments to the Pharmacy Agreement must be in writing and agreed to by both parties, with the following exception:

> Provider and ESI agree that ESI may amend this Agreement to comply with any changes required or suggested by the appropriate regulatory authorities in the course of discharging their responsibilities under applicable law and regulations.  ESI shall furnish Provider with written notice of such amendments.  In the event any such amendment constitutes a material change in the terms of the Agreement that is unacceptable to Provider, Provider may elect to terminate this Agreement by giving written notice of such election to terminate to ESI within 20 days of receipt of amendment, and such termination shall be effective no earlier than 60 days after receipt of written notice by ESI.

(Pharmacy Agreement § 9C.)  As set out below, the same is not true as to amendments to the Provider Manual.

The Pharmacy Agreement describes the Provider Manual as "a written description of practices, policies, rules and procedures provided by ESI for Pharmacies dispensing Covered Medications to Members."  (Pharmacy Agreement § 1.)  It also provides that "ESI may amend the Provider Manual and all policies and procedures of ESI, in its sole discretion, and such amendment shall not require consent of Provider or a Pharmacy."  (Pharmacy Agreement § 9C; *see also* Pharmacy Agreement § 1 ("The Provider Manual may be revised from time to time by ESI in its sole discretion.").)  The Pharmacy Agreement also contains a Missouri choice-of-law provision.  (Pharmacy Agreement § 9F.)

C.   **Provider Manual**

Between 1997 and 2001, the Provider Manuals in place pursuant to ESI's contracts with Pearson's and Altadena set out that ESI would update "drug information" on at least a "weekly basis."  (Macinski Dep. 193.)  In 2001, ESI began receiving daily AWP update information from First DataBank.  At the latest, in 2002, ESI amended the Provider Manual to reflect the change to daily AWP updating.[10]  In particular, the 2002 Provider Manual provided the following as to "online reimbursement calculation":

> [ESI] online claims processing system audits every claim.  You may be paid an amount other than what you submit as your ingredient cost, dispensing fee, or your Usual & Customary retail price. [ESI's] reimbursement is based on the lower of:

---

[10] The 2002 Provider Manual, titled "Guidelines, Policies and Procedures for [ESI] Participating Pharmacies," says on the cover page that the Provider Manual "is subject to the terms and conditions of the Pharmacy . . . Agreement.  Revisions, amendments and program updates will be periodically distributed to the Pharmacy Network."  (2002 Provider Manual (cover page)).  ESI periodically amended the Provider Manuals to replace previous Provider Manuals.

- Average Wholesale Price (AWP) less the contracted discount baseline price (as calculated by First DataBank) less the contracted discount for the specific network;

- MAC or submitted cost plus the contracted dispensing fee for that network or U&C, whichever is lowest.

*[ESI] will utilize First DataBank, or other comparably reliable sources as determined by [ESI], and will update drug information on a daily basis.*

(2002 Provider Manual 10 (emphasis added).)  The 2004 and 2005 Provider Manuals contain identical provisions.  (2004/2005 Provider Manuals § 2.3 (Exs. 11, 13 to Doc. # 57).)  As discussed *infra*, the above italicized language forms the basis of Plaintiffs' breach of contract claim.

**D.    Claims Adjudication Procedures**

With respect to AWP calculations, reimbursement for brand name prescription drug claims from pharmacies is calculated based upon the AWP that is in ESI's computer system on the date a prescription is filled.  (Macinski Dep. 236-37; *see also* Macinksi Dep. 76-84.) ESI has various computer systems it uses to adjudicate prescription drug claims.  The Stratus system is used to adjudicate workers' compensation prescription drug claims (Thomas Luft Dep. 181 (Ex. 5 to Doc. # 67)); the Anchor system is used to adjudicate commercial prescription drug claims (Kannady Dep. 106; Macinski Dep. 76-77); and the Mini-Anchor system is used to process U.S. Department of Defense ("DOD") prescription drug claims (Macinski Dep. 78).  (*See also* Kannady Dep. 146 (confirming that ESI's computerized pharmacy reimbursement systems are Stratus, Anchor and Mini-Anchor).)

7

As to the latter, in 2004, ESI developed a pharmacy network for the DOD and began processing claims for its TRICARE Retail Pharmacy Program ("TRRx").  Claims are reimbursed based upon weekly AWP updates.  (Luft Dep. 181, 183.)  As explained by Mr. Luft, ESI's vice president of client support and network operations (Luft Dep. 143), ESI has a relationship with "another vendor . . . called Emdeon," which is the DOD's "central source for benefits and co-pay calculation[s]," (Luft Dep. 181).  (*See also* Kannady Dep. 54, 61 (explaining that during the DOD claims adjudication process, Emdeon provides a Drug Utilization Review and verifies claim eligibility).)  Emdeon conducts only "weekly updates on [its] system," and, thus, for compatibility purposes, DOD required ESI to reimburse pharmacies based upon weekly AWP updates.  (Luft Dep. 181-82.)

With respect to non-DOD claims,[11] ESI receives daily AWP updates from First DataBank, but there can be a delay of approximately thirty hours between the time when ESI receives the AWP updates and when those updates are uploaded to the computer system.  (*See* Luft Dep. 48, 181-83; Doc. # 57 ¶ 25.)  Additionally, because "daily updates" are received from First DataBank Monday through Friday, and not on the weekend (Macinski Dep. 146-47), there is, as pointed out by Plaintiffs (Doc. # 69, at 16), a longer delay for AWP information received on Friday (Macinski Dep. 16 (Ex. 8 to Doc. # 62)).

---

[11] Mr. Luft testified that to his knowledge weekly updates are used to reimburse pharmacies only as to DOD name brand prescription drug claims.  (Luft Dep. 183.)  As to all other claims (*i.e.*, "non-DOD claims"), daily updates are used.

The following is a basic overview of ESI's daily updating schedule: ESI typically receives First DataBank files each business day between 7:00 p.m. and 2:00 a.m. (Demetrius Sanders Dep. 57, 82 (Ex. F to Doc. # 62).)  The received file is "unzipped" by 7:00 a.m. the next morning.  Any errors are resolved with First DataBank, and the file loading processes begin at 8:00 p.m.  (Sanders Dep. 47-48, 85.)  The drug information is updated to ESI's systems by midnight each business day, unless it is "future dated."  (Sanders Dep. 166-67.) The "majority" of AWP information loaded in the systems is postdated, and does not become effective for reimbursement until a later date.  (*See* Sanders Dep. 166-67 ("One little caveat . . . is that the majority of the drugs within the system are future dated.  So they won't have a date that's effective at midnight.  It would be effective at some future date.").)

E.    **Procedural History**

On February 15, 2006, Plaintiffs filed an Amended and Restated Class Action Complaint ("Amended Complaint"), alleging that ESI breached its contracts with Plaintiffs by failing to "fully reimburse" them based on a daily AWP updating schedule.[12]  (Am. Compl. ¶ 9 (Doc. # 8).)  Because brand name drug prices typically trend upward (Macinski Dep. 161-62), Plaintiffs allege that ESI's failure to make reimbursements based upon daily AWP updates have caused them to "lose money" and concomitantly have "increased [ESI's] profits."  (Am. Compl. ¶¶ 11, 23.)  In addition to the breach of contract claim (Count II), the Amended Complaint contains claims for misrepresentation and suppression (Count I), and

---

[12] The Amended Complaint is the operative complaint.  The lawsuit was filed on January 26, 2006.

unjust enrichment and constructive trust (Count III).  Count IV, labeled "injunctive relief,"
requests the court to "require [ESI] to fully, properly and timely reimburse Plaintiffs" and to
require ESI "to properly reimburse Plaintiffs . . . using the 'real time' Average Wholesale
Price."  (Am. Compl. ¶ 30.)

On June 7, 2007, the court granted ESI's Rule 12(b)(6) motion to dismiss Count I
(fraudulent misrepresentation and suppression) and Count III (unjust enrichment and
constructive trust) of the Amended Complaint.[13]  (2007 Mem. Op. & Order (Doc. # 27).)
Only Counts II and IV remain.  Count II is a breach of contract claim, and Count IV
embodies a request for injunctive relief.

Subsequently, the parties jointly moved for a stay on the ground that "[a]n identical
national class action asserting the same claims [against ESI was] . . . pending in the United

---

[13] Plaintiffs alleged that, contrary to the terms of the Pharmacy Agreement, ESI misrepresented and suppressed the "true nature" of the reimbursement program.  (Am. Compl. ¶ 14.)  Dismissing the misrepresentation claim with prejudice, the court found that the alleged written misrepresentation in the Pharmacy Agreement – *i.e.*, an allegedly ambiguous meaning of the term AWP – could not, without more, give rise to fraud under Alabama law.  Because Plaintiffs had not alleged a written or an oral misrepresentation extraneous to or independent of the contract, the fraud claim was an impermissible attempt by Plaintiffs to convert a breach of contract claim into a fraud action.  (2007 Mem. Op. & Order 4-7 (Doc. # 27).)  The portion of Plaintiffs' misrepresentation claim based upon an extraneous oral or written misrepresentation was dismissed without prejudice for failure of Plaintiffs to plead with specificity.  (2007 Mem. Op. & Order 7-8.)  Notably, no amendment to revive this misrepresentation claim has been sought.

The court also dismissed with prejudice the fraudulent suppression claim, which was based on allegations that ESI did not disclose that it would not reimburse Plaintiffs based upon the daily AWP.  (Am. Compl. ¶ 16e.)  The court found that Plaintiffs had failed to allege facts revealing a confidential or special relationship between the parties and demonstrating that Plaintiffs directly requested from ESI information pertaining to the reimbursement method.  (2007 Mem. Op. & Order 8-9.)  The Amended Complaint, therefore, contained no facts alleging that ESI had a duty to make the complained-of disclosure.  As to Count III, the court concluded that Plaintiffs had a valid remedy at law for any alleged breach of contract, requiring dismissal of Plaintiffs' unjust enrichment and constructive trust claim.

States District Court for the Northern District of Oklahoma."[14]  (Mot. to Stay 1 (Doc. # 38)

(citing *Inola Drug, Inc. v. Express Scripts, Inc.*, No. 4:06cv117 (N.D. Okla. Feb. 22, 2006).)

In their motion, the parties stipulated that the purpose for the stay was to avoid the "risk of

inconsistent rulings among the two cases" and to "promote judicial economy and efficiency."

(Mot. to Stay ¶¶ 5-6.)  Based upon the parties' representations, the court stayed this action

pending a decision in *Inola Drug*, and required the parties to submit periodic joint reports as

to the status of that litigation.  (Order Staying Case (Doc. # 39).)  Approximately thirteen

months after the stay in this case went into effect, the court in the Northern District of

Oklahoma denied the plaintiff's motion for class certification, and denied the plaintiff's

motion for partial summary judgment on the breach of contract claim, but granted ESI's

motion for summary judgment on the claims for breach of contract and injunctive relief.  *See*

*Inola Drug v. Express Scripts, Inc.*, No. 06-cv-117, 2009 WL 801838 (N.D. Okla. March 25,

2009).  As to the plaintiff's motion for class certification, made pursuant to Rule 23(b)(3) of

the Federal Rules of Civil Procedure, the court found that, "[t]o the extent plaintiff seeks

certification of a class and subclass to pursue breach of contract claims, entry of summary

judgment against plaintiff on those claims precludes class certification."  *Inola Drug*, 2009

WL 801838, at *7.

---

[14] Neither Pearson's nor Altadena was a plaintiff in that action.  The plaintiff was Inola Drug, Inc., which operated a pharmacy in Rogers County, Oklahoma (*see Inola Drug* Compl. (Ex. 2 to Doc. # 69)), and had entered into a contract with ESI, "pursuant to which it participated in various pharmacy networks," *Inola Drug, Inc. v. Express Scripts, Inc.*, No. 06-cv-117, 2009 WL 801838, at *1 (N.D. Okla. March 25, 2009).

Based upon the decision in *Inola Drug*, the stay in this case was lifted, and pursuant to a court directive, the parties submitted an amended discovery plan, in compliance with Rule 26(f) of the Federal Rules of Civil Procedure.  (Order Lifting Stay (Doc. # 52); Rule 26(f) Plan (Doc. # 53).)  The parties "stipulate[d] that any discovery in *Inola Drug* [could] be used in briefing the issues in this case, subject to all other evidentiary objections and subject to the same terms of confidentially agreed to under the Protective Order in *Inola Drug*." (Rule 26(f) Plan 3.)  Citing judicial economy, the parties also requested that the court enter a briefing schedule "to resolve whether the threshold contract issues would moot any need to address the issue of class certification[.]"  (Rule 26(f) Plan 3.)  The court granted the request and set a briefing schedule for the submission of summary judgment motions on the breach of contract claim.  (Briefing Order (Doc. # 54).)  Motions for summary judgment followed and are ripe for consideration.

### III.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*); Fed. R. Civ. P. 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law."). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."). What is material is determined by the substantive law applicable to the case. *Celotex*, 477 U.S. at 248; *see also Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome

13

of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable factfinder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *see also Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine issue of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).  Only if the factual dispute is "genuine," however, must the court view the facts in the light most favorable to the non-movant. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Estate of Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("The requirement to view the facts in the nonmoving party's favor extends only to 'genuine' disputes over material facts.").

If the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Conclusory allegations based on subjective beliefs

14

are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*) (The plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment."). Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment may be granted in favor of the moving party. *Celotex*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Thus, in cases where the evidence before the court is admissible on its face or can be reduced to admissible form and indicates there is no genuine issue of material fact, and where the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact).

## IV. DISCUSSION

### A. __Breach of Contract__

#### 1. *General Principles of Contract Law*

"'[A] federal district court sitting in diversity must apply the choice of law rules of the forum state.'" *Rando v. Gov't Employees Ins. Co.*, 556 F.3d 1173, 1176 (11th Cir. 2009)

(quoting *McGow v. McCurry*, 412 F.3d 1207, 1217 (11th Cir. 2005)).   In Alabama, contractual choice-of-law provisions generally are honored, *see Ex parte HealthSouth Corp.*, 974 So. 2d 288 (Ala. 2007), and here, the Pharmacy Agreement specifies that Missouri law governs the interpretation of the contract (Pharmacy Agreement § 9F).   Neither party has argued the applicability of a different state's law.   The court, therefore, applies Missouri law to resolve the parties' disagreements.

To establish a breach of contract claim under Missouri law, a party must show "(1) the existence of a contract or agreement and the terms of that agreement; (2) that plaintiff performed or tendered performance; (3) that defendant did not perform; and (4) that defendant's failure to perform caused plaintiff damage." *Venable v. Hickerson, Phelps, Kirtley & Assocs., Inc.*, 903 S.W.2d 659, 664 (Mo. Ct. App. 1995).   "'The cardinal rule of contract interpretation is to ascertain the parties' intention and to give effect to that intention.'" *Newco Atlas, Inc. v. Park Range Constr., Inc.*, 272 S.W.3d 886, 891 (Mo. Ct. App. 2008) (quoting *Sonoma Mgmt. Co. v. Boessen*, 70 S.W.3d 475, 479 (Mo. Ct. App. 2002)).   If a contract contains unambiguous terms, "the intent of the parties will be ascertained from the language of the contract alone and not from extrinsic or parol evidence of intent." *Id.*   "'A contract is ambiguous only if its terms are reasonably open to more than one meaning, or the meaning of the language used is uncertain.'" *Id.* (quoting *Sonoma Mgmt. Co.*, 70 S.W.3d at 479).   However, "[a] contract is not rendered ambiguous simply because the parties disagree as to its construction." *Id.*

Missouri law also permits contractual "sole discretion" clauses, as long as they are undertaken in good faith. *Cordry v. Vanderbilt Mortgage & Finance, Inc.*, a diversity action, is illustrative. *See* 370 F. Supp. 2d 923 (W.D. Mo. 2005), *aff'd*, 445 F.3d 1106 (8th Cir. 2006). There, the plaintiff was a retail seller of manufactured homes and entered into an agreement with a financial institution for "floorplan refinancing." *Id.* The financing agreement provided that the lender could, in its "sole discretion," loan up to 65 percent of the value of used manufactured homes that were no more than five model years old and up to 60 percent for those that were between six and ten model years old. *See id.* By virtue of the "sole discretion" clause, the lender also could deny financing altogether. *Id.* at 927. It was argued, and accepted by the court, that the lender always provided financing at the maximum percentages provided in the agreement. *See id.* at 927-28. However, when a second lender assumed the financing agreement, *see id.* at 926, it offered financing on four manufactured homes of only 35 percent of their value, and the plaintiff sued for breach of contract, *see id.* at 927.

Applying Missouri law, the court found that the word "discretion" in the agreement was "not ambiguous and [had to be] enforced for its obvious meaning." *Id.* at 928 (citing *Mo. Consol. Health Care Plan v. Cmty. Health Plan*, 81 S.W.3d 34, 48 (Mo. Ct. App. 2002)). It further opined that the second lender's business decision to offer financing at a percentage less than the contractual maximum cutoff was "expressly permissible" under the "sole discretion" clause, and could not amount to a breach of contract "so long as [the second

17

lender] acted in good faith and fair dealing . . . ."  *Id.* at 927; *see also Cordry*, 445 F.3d at 1112 ("When a decision is left to the discretion of one party, the question is not whether the party made an erroneous decision but whether the decision was made in bad faith or was arbitrary or capricious so as to amount to an abuse of discretion." (quoting *Mo. Consol. Health Care Plan*, 81 S.W.3d at 48)).  The good-faith requirement ensured that the party in whom sole discretion was placed would not have "wholly unfettered, unreviewable decisionmaking."  *Cordry*, 370 F. Supp. 2d at 931.  Arguing bad faith, the plaintiff pointed to evidence that the second lender did not inquire of the first lender how the financing typically was arranged under the agreement.  At most, the court concluded that the plaintiff's argument equated a lack of diligence on the part of the second lender, but that "a mere lack of diligence [was] not the same as demonstrating 'bad faith.'"  *Id.*  In the end, the court entered summary judgment on the breach of contract claim in favor of the second lender.  *See id.* at 928-29.  The Eighth Circuit affirmed.  *See Cordry*, 445 F.3d at 1106.

### 2.     Arguments

Plaintiffs have moved for partial summary judgment on their claim for breach of contract regarding reimbursement of DOD brand name prescription drug claims.[15]  (Doc.

---

[15]  Plaintiffs' breach of contract claim can be categorized as containing two theories.  First, as stated above, the weekly updates used to reimburse pharmacies for filling DOD brand name prescription drugs breached their contracts, and, second, as to non-DOD claims, the thirty-hour lag time in uploading the daily AWP updates into the system breached the contract.  Plaintiffs have not moved for summary judgment as to the latter theory.  Plaintiffs, however, have moved for summary judgment on two of ESI's affirmative defenses to the breach of contract claim (waiver and statute of limitations).  (Doc. # 57, at 12-13.)  Given the court's finding that ESI is entitled to summary judgment on the merits of the breach of contract claim, the court need not address Plaintiffs' summary judgment arguments pertaining to these affirmative defenses.

# 57, at 9.)  Citing the Provider Manual's provision that ESI "will update drug information on a daily basis" (*see, e.g.,* 2002 Provider Manual 10), Plaintiffs contend that ESI is contractually obligated to reimburse them based upon a brand name prescription drug's AWP as updated on a daily basis.  Plaintiffs argue that, with respect to DOD claims, ESI breached the terms of their contracts by using *weekly* AWP updates to calculate reimbursements for brand name prescription drugs.  (Doc. # 57, at 10.)

It is undisputed that ESI did not update AWP on a daily basis as to DOD brand name prescription drug claims processed through the Mini-Anchor system.  (Luft Dep. 181-83.)  Even with that concession, however, ESI contends that it is entitled to summary judgment not only on the breach of contract claim regarding the DOD prescription drug reimbursement method, but as to all Plaintiffs' breach of contract theories.  ESI specifically argues that the Pharmacy Agreements it entered into with Pearson's and Altadena "clearly and unambiguously" gave ESI the "sole discretion" to "amend the Provider Manual and all policies and procedures of ESI" (Pharmacy Agreement § 9C), and that absent evidence (of which it says there is none) that ESI exercised its discretion in bad faith, or acted arbitrarily or capriciously, it is entitled to summary judgment on the breach of contract claim in its entirety.

ESI relies primarily on *Inola Drug*.  Not surprisingly, Plaintiffs argue that *Inola Drug* was "wrongly decided" and emphasize that the judgment is on appeal.  (Doc. # 69, at 3 n.3.)

### 3. *Analysis*

In *Inola Drug*, summary judgment was entered in favor of ESI on the plaintiff's claims for breach of contract and injunctive relief. *See* 2009 WL 801838. The plaintiff's breach of contract claim, which was twofold, was premised on the statement in the Provider Manual that "'drug information will be updated on a daily basis.'" *Id.* at *5 (quoting Provider Manual § 2.3). First, as to the Mini-Anchor system used to process DOD claims, the plaintiff argued that ESI breached the Pharmacy Agreement based upon its "practice of updating the AWPs weekly rather than daily[.]" *Id.* With respect to claims adjudicated under the Anchor and Stratus systems (*i.e.*, non-DOD claims), the court interpreted the complaint[16] as alleging that ESI breached the Pharmacy Agreement (1) because it failed to update AWPs on a "real time" basis and (2) because "the lag time of approximately 30 hours between ESI's receipt of daily updates from First DataBank and its 'loading' of the updates onto its own system violate[d] the terms of the Provider Manual." *Id.* at *6.

The Pharmacy Agreement in *Inola Drug* was "silent on the question of AWP updates[,]" but the Provider Manual indicated, as stated, that "drug information w[ould] be updated on a daily basis." *Id.* at *5 (internal quotation marks omitted). The Pharmacy Agreement vested in ESI the "sole discretion" to amend the Provider Manual, without having to obtain the pharmacy's consent or provide it notice. *Id.*

---

[16] *See infra* for a discussion of the *Inola Drug* plaintiff's argument raised in its post-judgment motion that the court had misinterpreted the nature of its claim.

Applying Missouri law in accordance with the Pharmacy Agreement's choice-of-law provision, *see id.* at *4, the court explained that contractual "sole discretion" clauses were "valid and enforceable, provided the party with discretion acts in good faith," *id.* (citing *Cordry*, 370 F. Supp. 2d at 927).  With respect to the Mini-Anchor system used to adjudicate DOD claims, the court found that ESI was entitled to summary judgment because the evidence was uncontested that "weekly updating was implemented [by ESI] to accommodate DOD's vendor."  *Id.*  No evidence was submitted "of bad faith or abuse of discretion in connection with this practice."  *Id.*  With respect to the Anchor and Stratus systems, the court observed that neither the Pharmacy Agreement nor the Provider Manual required ESI to update AWPs on a "real time" basis.  *Id.* at *6.  It found that "ESI in fact updates the drug cost information daily, albeit not instantaneously with its receipt of updates from First DataBank."  *Id.*  It also found that the evidence was undisputed that the "30-hour lag time between receipt, verification and loading of First DataBank updates [was] customary and ordinary in the industry."[17]  *Id.*  Additionally, the court reiterated that the Pharmacy Agreement gave ESI the unfettered "right to revise policies and procedures in the Provider Manual and ESI's internal policies and procedures at its sole discretion with plaintiff's consent or notice to plaintiff."  *Id.*  For these reasons, ESI was entitled to summary judgment

---

[17] On the plaintiff's motion for reconsideration, the court retracted its reliance on an "industry standard," agreeing with the plaintiff that the evidence was insufficient to support that finding.  *Inola Drug, Inc. v. Express Scripts, Inc.*, No. 06-cv-117, 2009 WL 2175624, at *2 (N.D. Okla. July 14, 2009). It, however, found that this retraction did "not affect the [c]ourt's conclusion that ESI updates drug information on the commercial pharmacy claims on a daily basis."  *Id.*

on the breach of contract claim.  *Id.*  Finally, the court found that the request for injunctive

relief, "[t]o the extent . . . based on alleged breach of contract," could not survive summary

judgment.  *Id.*

Here, Plaintiffs do not dispute that the *Inola Drug* court correctly recited the

applicable law as articulated by the Missouri courts.  They also agree that under Missouri

law, "sole discretion" clauses "may be enforced if exercised in good faith[.]"  (Doc. # 69,

at 13; Doc. # 73, at 3 n.1.)  Plaintiffs, however, argue that *Inola Drug* is distinguishable on

its facts.  (Doc. # 69 at 3 n.3.)  They say that "unlike the present case," the complaint in *Inola*

*Drug did* contend that [ESI] had breached its contract by not updating in 'real time.'"  (Doc.

# 69, at 3 n.3 (citing *Inola Drug* Compl (Ex. 2 to Doc. # 69)).)  They say, however, that in

this case, the breach of contract claim is premised solely upon ESI's "'practice of failing to

properly reimburse Plaintiffs based upon *daily* AWP updates for brand name prescription

drugs[.]'"  (Doc. # 69 at 3 n.3 (quoting Am. Compl. ¶ 23; emphasis added).)  Hence,

Plaintiffs argue that the *Inola Drug* decision was premised upon an allegation that ESI

violated "real time," not daily, updating requirements, and, thus "has no application" here.

(Doc. # 73, at 3 n.1; *see also* Doc. # 69, at 3 n.3.)  Plaintiffs' argument is a bit of a stretch.

In *Inola Drug*, the plaintiff filed a motion to alter or amend the opinion, pursuant to

Rule 59(e) of the Federal Rules of Civil Procedure.  *See Inola Drug, Inc. v. Express Scripts,*

*Inc.*, No. 06-CV-117, 2009 WL 2175624, at *1 (N.D. Okla. July 14, 2009).  As one ground

for its motion, the plaintiff argued that "the court erroneously characterized the focus of [the

plaintiff's] breach of contract claim on the Anchor and Stratus systems as 'failure to update

AWPs on a 'real time' basis.'" *Id.* at *2. Addressing the argument, the court explained that

it merely had borrowed the phrase "real time" from the plaintiff's complaint. *Id.*

Notwithstanding the complaint's references to "real time" updating, the court elucidated that

it "did not misapprehend" the crux of the plaintiff's argument made in response to the

summary judgment motion. *Id.* That argument was:

> "Defendant admits it does not update its AWP drug information on the same
> day the information is received. There is a delay. In the case of commercial
> pharmacy claims, non DOD claims, AWP drug information is not used to
> reimburse pharmacies until at least two days after it is received. For instance,
> AWP drug information received on Monday is not used to reimburse
> pharmacies until Wednesday."

*Id.* (quoting the plaintiff's brief). The court emphasized that it had expressly rejected the

claim that the delays in uploading the daily AWP updates in the Anchor and Stratus systems

did not breach the contract. That rejection occurred when the court found that "the lag time

between ESI's receipt of daily updates from First DataBank and its loading of the updates

onto its own system is not a breach of the Agreement." *Id.* The dialogue between the *Inola*

*Drug* court and the plaintiff on reconsideration deflates Plaintiffs' argument that *Inola Drug*

is "factually distinguishable." (Doc. # 69, at 3 n.3.)

Plaintiffs' attempt to factually distance the claims in this case from those in *Inola*

*Drug* also ignores the virtual identity of the breach of contract claims filed in each action.

A comparison of the complaints reveals that both are predicated upon allegations that ESI

engaged in a practice of failing to reimburse pharmacies based upon *daily* AWP updates and,

therefore, breached its contracts with the plaintiffs.  (*Compare* Am. Compl. ¶ 23 (ESI's "practice of failing to properly reimburse Plaintiffs based upon daily AWP updates for brand name prescription drugs . . . constitutes a breach of contract for which Plaintiffs have been damage[d]."), with *Inola Drug* Compl. ¶ 43 (ESI's "practice of failing to properly reimburse the Plaintiff based upon daily AWP updates for prescription drugs . . . constitutes a breach of contract for which the Plaintiff has been damaged." (Ex. 2 to Doc. # 69)).)[18]  Additionally, as made clear from the summary judgment arguments (Doc. # 57, at 9-11), Plaintiffs' claim is based upon an alleged breach of the same provision in the Provider Manual upon which the *Inola Drug* plaintiff predicated its breach of contract claim.  Namely, Plaintiffs and the *Inola Drug* plaintiff cite the provision in the 2002 and subsequent Provider Manuals providing that ESI "will update drug information on a daily basis."  (*See, e.g.,* 2002 Provider Manual 10; Doc. # 57 ¶ 18); *Inola Drug*, *see* 2009 WL 801838, at *5 (explaining that the plaintiff's breach of contract claim was based upon § 2.3 of the Provider Manual that "'drug information will be updated on a daily basis.'"); *see also Inola Drug*, 2009 WL 801838, at *4 (reciting that ESI's "online reimbursement calculation" provided that ESI "w[ould] update drug information on a *daily* basis").  Also, as in *Inola Drug*, *see* 2009 WL 801838, at *3, the Pharmacy Agreement here does not address ESI's updating obligations and gives ESI "sole

_____

[18] The similarities between the two actions also are reflected in the claims for injunctive relief. (*Compare* Am. Compl. ¶ 30 ("Plaintiffs respectfully request that this Honorable Court require [ESI] to fully and timely reimburse Plaintiffs . . . and that [ESI] be required to properly reimburse Plaintiffs . . . using the 'real time' Average Wholesale Price."), with *Inola Drug* Compl.¶ 59 ("The Plaintiff further requests this Court to require [ESI] to fully, properly, and timely reimburse the Plaintiff . . . and that [ESI] be required to properly reimburse the Plaintiff . . . using the 'real time' AWP.'").)

discretion" to "amend the Provider Manual and all policies and procedures of ESI," without having to obtain consent from Plaintiffs.  (Pharmacy Agreement § 9C; *see also* Pharmacy Agreement § 1 ("The Provider Manual may be revised from time to time by ESI in its sole discretion.").)  In sum, the court finds that there are no material factual distinctions between this case and *Inola Drug*.

The court also finds the reasoning of *Inola Drug* persuasive.  Here, as in *Inola Drug*, *see* 2009 WL 2175624, at *5, ESI has submitted evidence that the reason ESI updates drug information on a weekly basis for DOD claims was to ensure that updates were compatible with the practice of DOD's vendor, which followed an industry standard of weekly updates. ESI also has submitted evidence that, with respect to non-DOD claims, the reason for the lag time in updating ESI's systems with the daily drug information was to permit ESI to unzip files, correct errors, and complete a loading process.  Similar evidence was submitted in *Inola Drug*.  *See Inola Drug*, 2009 WL 2175624, at *4.  The *Inola Drug* court rejected the plaintiff's claims and arguments.  It found ESI's evidence undisputed, the "sole discretion" clause valid, and an absence of evidence of bad faith or abuse of discretion by ESI in the exercise of its sole discretion.

Here, however, Plaintiffs argue that there is "factual question" as to whether ESI satisfies the "good faith" standard.  Plaintiffs contend that ESI has the capability "to update its system much sooner than it does, but refuses to do so in order to create greater profit for

itself and its clients." (Doc. # 69, at 16.)  As evidentiary support for the argument, Plaintiffs

point to Ms. Macinski's deposition testimony, in particular, the following:

> Q.     And if there is a lag in updating the AWP on brand name drugs, would that
> benefit the pharmacists more or would that benefit your customers more?
>
> . . .
>
> A.     [W]ell, . . . if the price is going up, obviously, it's going to benefit the client.
> If the price is going down, it's going to benefit the pharmacy.

(Macinksi Dep. 162.)  Ms. Macinski clearly recites the "obvious[]" as to the relationship

between a price increase and an uploading delay – *i.e.*, ESI gets the benefit.  Ms. Macinski's

testimony, however, does not speak to the capabilities of the technology used to upload daily

AWP updates into the systems, touch upon ESI's reasoning for the "lag" time, or suggest that

any delay was intended to increase profits at Plaintiffs' expense.  To the contrary, as to DOD

claims, the evidence is undisputed that DOD protocol required ESI to adopt DOD's vendor's

practice of updating drug information on a weekly, rather than a daily, basis, and that ESI did

"not have control over" that requirement.  (Lisa Howard Dep. 186 (Ex. # E to Doc. # 62).)

Bad faith simply cannot be gleaned from Ms. Macinski's testimony; at best, her testimony

presents but "[a] mere 'scintilla' of evidence."  *Walker*, 911 F.2d at 1577 ("A mere 'scintilla'

of evidence supporting the [nonmovant's] position will not suffice; there must be enough of

a showing that the [trier of fact] could reasonably find for that party.").  No other evidentiary

basis for finding a material factual dispute with respect to ESI's bad faith has been advanced

by Plaintiffs.  Moreover, the sole case upon which Plaintiffs rely (Doc. # 69, at 16) is cited

not for its factual similarities – indeed, it is factually inapposite – but only for the general

26

proposition of law that the implied covenant of good faith and fair dealing prevents a party to a contract from "exercis[ing] a judgment conferred by the express terms of the agreement in such a manner that . . . denies the other party the expected benefit of the contract." *Acetylene Gas Co. v. Oliver*, 939 S.W.2d 404, 410 (Mo. Ct. App. 1996).

Plaintiffs' other arguments are equally unpersuasive.  Plaintiffs contend that ESI's "entire defense" – *i.e.*, its reliance on the "sole discretion" clause – is "absurd[]" because it rests on a theory that ESI could "do whatever it wanted" under the contract; thus, according to Plaintiffs, if it chose, ESI could "refuse to reimburse Plaintiffs at all and still require them to fill prescriptions."  (Doc. # 69, at 11.)  Plaintiffs argue that the potential for ESI to apply its discretion in this manner renders the Pharmacy Agreement illusory.  (Doc. # 69, at 13.) The court disagrees.

On appeal, the plaintiff in *Cordry* unsuccessfully raised a similar protestation.  The plaintiff argued that a contractual "sole discretion" clause was illusory because it permitted the lender to lend any percentage less than 60 or 65 percent for any used manufactured home, "including lending nothing." *Cordry*, 445 F.3d at 1110.  The Eighth Circuit rejected the argument.  As explained by the *Cordry* court:

> "The phrase 'illusory promise' means 'words in promissory form that promise nothing.'  An illusory promise is not a promise at all and cannot act as consideration; therefore no contract is formed." *Magruder Quarry & Co. v. Briscoe*, 83 S.W.3d 647, 650 (Mo. Ct. App. 2002) (quoting Corbin on Contracts § 5.28).  However, it is well-settled that "an implied obligation to use good faith is enough to avoid finding a contract null and void due to an illusory promise." *Id.* at 650-51.  For example, *Magruder Quarry* held that a quarry lease was not void as illusory, even though the lessees had the

27

discretion not to mine any rock at all, because the lessees were under an implied covenant of good faith and fair dealing to use reasonable efforts to mine rock. *Id.* at 650-52. Similarly, in the instant case [the lender] was bound by the implied covenant of good faith and fair dealing to use reasonable efforts to finance used homes for [the plaintiff], as the covenant is implied in all contracts in Missouri. *Id.* at 651. Therefore, the discretion granted by [the financing agreement] does not render the agreement illusory.

*Id.* at 1110.

Here, contrary to Plaintiffs' arguments, under Missouri law the sole discretion clause does not give ESI unbridled leeway to amend the Provider Manual in absolutely any manner it wants. Rather, ESI's discretion is tempered by the requirement that it act in good faith and fairness. The inclusion of the sole discretion clause in the Pharmacy Agreement, therefore, does not make the contract illusory.

Next, Plaintiffs argue that ESI only had "sole discretion" to amend its "policies and procedures," not the "material terms" of the contract. (Doc. # 69, at 11.) Plaintiffs contend that the "formula for reimbursement" based upon AWP is not a "policy" or "procedure"; rather, it "substantially affects how much Plaintiffs . . . will be reimbursed" and, thus, is "one of the most important of all the material terms." (Doc. # 69, at 12.) Plaintiffs cite no authority, other than a Merriam-Webster online dictionary definition of "policy" and "procedure" (Doc. # 69, at 11-12), that supports their assertion. These definitions provide no basis for supplanting one of the key terms of the "sole discretion" clause. That term, which Plaintiffs' argument overlooks, provides that ESI in "its sole discretion," and without the consent of the pharmacy, can amend not only its "policies and procedures," *but also* "the

Provider Manual." (*See* Pharmacy Agreement § 9C ("ESI may amend the *Provider Manual and all policies and procedures of ESI*, in its sole discretion, and such amendment shall not require consent of Provider or a Pharmacy." (emphasis added)); *see also* Pharmacy Agreement § 1 (describing the Provider Manual as "a written description of practices, policies, rules and procedures").) As in *Inola Drug*, 2009 WL 801838, at *5, the Provider Manual, not the Provider Agreement, was the document that governed how ESI updated the AWP, and, by its plain language, the Pharmacy Agreement gave ESI the sole discretion to amend the Provider Manual – any part of it which necessarily includes the AWP updating procedures set out in that manual. Moreover, Plaintiffs agreed to these terms, and under Missouri law, "'[p]arties are generally free to contract as they wish, and courts will enforce contracts according to their plain meaning, unless induced by fraud, duress, or undue influence.'" *Cordry*, 445 F.3d at 1110 (quoting *Util. Serv. & Maint., Inc. v. Noranda Aluminum, Inc.*, 163 S.W.3d 910, 913 (Mo. 2005) (en banc)). Plaintiffs have not submitted evidence of, or argued, fraud, duress, or undue influence.

Finally, Plaintiffs argue that, even assuming *arguendo* that ESI could amend the AWP updating procedures without their consent and at their sole discretion, amendments to the Provider Manual by ESI, resulting in it no longer reimbursing pharmacies based upon daily AWP updates, had to be "formal" and "written" and "distribute[d]" to the pharmacies in the form of an updated Provider Manual. (Doc. # 69, at 14-15.) Plaintiffs argue that there is "no factual support for the contention that [ESI] actually made such an amendment." (Doc. # 69,

at 15.)  Hence, according to Plaintiffs, ESI's alleged "failure to use daily AWP updates is not an 'amendment' to the contract; it is a breach of the contract."  (Doc. # 69, at 15.)

As support for their argument, Plaintiffs cite the cover page of the Provider Manual, which provides that the "[r]evisions, amendments and program updates [of the Provider Manual] will be periodically distributed to the Pharmacy Network.  (*See, e.g.*, 2002 Provider Manual (cover page).)  This language does not establish any mandatory time intervals or periods for distribution of amended Provider Manuals.  Significantly, it also does not, as astutely recognized in *Inola Drug*, "limit or delay until distribution the effective date of amendments which the contract grants ESI sole discretion to make."  2009 WL 2175624, at *1.  The language from the cover page of the Provider Manual simply does not support Plaintiffs' position.

In sum, based upon the summary judgment record, the court finds that there is no genuine issue of material fact as to whether ESI is liable for breach of contract. Consequently, ESI's motion for summary judgment on the breach of contract claim is due to be granted,[19] and Plaintiffs' motion for partial summary judgment on the breach of contract claim is due to be denied.

**B.    Injunctive Relief**

Count IV of the Amended Complaint, labeled "injunctive relief," requests the court to "require [ESI] to fully, properly and timely reimburse Plaintiffs" and to require ESI "to

---

[19] It, therefore, is not necessary to address ESI's argument that Plaintiffs failed to present any evidence that they suffered damages.

properly reimburse Plaintiffs . . . using the 'real time' Average Wholesale Price." (Am. Compl. ¶ 30.) The sole remaining substantive claim for breach of contract, however, cannot survive Rule 56 scrutiny; thus, neither can the request for injunctive relief. Accordingly, ESI's motion for summary judgment on Count IV is due to be granted.

## V. CONCLUSION

Summary judgment is appropriate on the breach of contract claim in Count II. ESI had a contractual right, valid under Missouri law, to exercise sole discretion over amendments to the Provider Manual, the document governing ESI's AWP updating methods. In response to ESI's properly supported motion for summary judgment, Plaintiffs have failed to create a genuine issue of material fact that ESI exercised its discretion in bad faith, or arbitrarily or capriciously. Because the breach of contract claim fails and no other substantive claim remains, it necessarily follows that Plaintiffs are not entitled to the injunctive relief sought in Count IV. Summary judgment, therefore, is due to be entered against Plaintiffs on that count as well. Furthermore, as stated, *see supra* note 4, the court has not relied upon the evidence that is the subject of the motion to strike; the motion to strike, therefore, is moot.

Accordingly, it is ORDERED that:

(1)    Plaintiffs' motion to strike (Doc. # 67) is DENIED as moot;

(2)    Plaintiffs' motion for partial summary judgment (Doc. # 57) is DENIED; and

(3)    ESI's motion for summary judgment (Doc. # 62) is GRANTED.

An appropriate judgment will be entered.

DONE this 29th day of October, 2009.

/s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE